[Cite as *In re R.W.*, 2020-Ohio-4861.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN THE MATTER OF:

R.W., III and A.W.

MINOR CHILDREN

JUDGES:
Hon. John W. Wise, P. J.
Hon. Patricia A. Delaney, J.
Hon. Craig R. Baldwin, J.

Case Nos. 2020 CA 00014 and 00015

O P I N I O N

CHARACTER OF PROCEEDING:     Appeal from the Court of Common Pleas, Juvenile Division, Case Nos. 2019 JCV 00993 and 2020 JCV 00994

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     October 7, 2020

APPEARANCES:

For Appellee

BRANDON J. WALTENBAUGH
STARK COUNTY JFS
402 2nd Street, SE
Canton, Ohio  44702

For Appellant Father

AARON KOVALCHIK
116 Cleveland Avenue, NW
Suite 808
Canton, Ohio  44702

*Wise, P. J.*

{¶ 1}  Appellant-Father R.W. appeals from the judgment entered in Stark County Court of Common Pleas, Juvenile Court Division, which terminated all parental rights, privileges and responsibilities of the parents with regard to the minor children A.W. and R.W. and ordered that permanent custody of the minor children be granted to Stark County Department of Job and Family Services (SCJFS).

{¶ 2}  This appeal is expedited and is being considered pursuant to App.R.11.2(C). The relevant facts leading to this appeal are as follows:

STATEMENT OF THE FACTS AND CASE

{¶ 3}  This appeal pertains to the permanent custody disposition of the two minor children of Appellant-Father R.W. and Mother A.W.

{¶ 4}   On July 10, 2019, Stark County Job and Family Services (hereinafter "SCJFS") filed a complaint alleging the dependency, neglect, and/or abuse of R.W. (DOB 8/17/2016) and A.W. (DOB 11/29/2014).

{¶ 5}  On July 11, 2019, the trial court held an emergency shelter care hearing and found that probable cause existed for the involvement of SCJFS, continued residence of the children in the home would be contrary to their best interests and welfare, and SCJFS made reasonable efforts to prevent the need for placement and/or to make it possible for the children to return home or remain in the home. The trial court also placed the children into the emergency temporary custody of SCJFS.

{¶ 6}  On October 3, 2019, the trial court continued the case for a later date after Appellant requested counsel.

**{¶ 7}** On October 4, 2019, SCJFS filed a motion to dismiss the case without prejudice, after it was determined that the case could not be disposed of before the statutorily-mandated deadline. The trial court granted that motion.

**{¶ 8}** On October 4, 2019, SCJFS re-filed the permanent custody complaint alleging the abuse, dependency and/or neglect of A.W. (DOB 11/29/2014) and R.W. III (DOB 08/17/2016).

**{¶ 9}** On October 7, 2019, an emergency shelter care hearing was held where the trial court found probable cause for the involvement of SCJFS, and that SCJFS had made reasonable efforts to prevent the need for removal of the children from the home. The trial court also awarded emergency temporary custody of the children to SCJFS.

**{¶ 10}** The concerns leading to these cases stem from history with the agency; previously removing the children and a two year case plan. The concerns in those prior cases, 2017JCV01010, and 2017JCV01011, centered on lack of supervision, poor home conditions, substance abuse, domestic violence, and Mother allowing inappropriate individuals around her children. In the prior cases, both of the children were found neglected on November 3, 2017. Mother did complete case plan services, and custody was returned to Mother on July 5, 2019. Agency involvement was terminated that same day. Both Goodwill Parenting Services, (In home), and NYAP were to remain active in the home after the closure.

**{¶ 11}** However, unknown to either the ongoing caseworker or the Guardian-ad-Litem, Mother had been involved in a domestic violence incident on June 29, 2019. According to the police report, Mother had been allowing Clarence O. to "hangout" at her residence and around her children. Clarence became aggressive and was told to leave

the residence. He later returned and kicked the back door in to gain access to the residence. Clarence became more aggressive when Mother refused to give him money. Mother was then assaulted in what became an ongoing altercation throughout the home. Mother eventually stabbed Clarence and fled to the children's bedroom. Mother and the children then fled to the roof of the residence for protection. Responding officers found Mother and all four of her children, including A.W. and R.W. III, on the roof of the residence, screaming and crying. Clarence was located, arrested and charged with Aggravated Burglary.

{¶ 12} Appellant-Mother failed to report this incident to either the ongoing caseworker in the prior case or the trial court at the hearing held on July 5, 2019.

{¶ 13} The Agency learned of the incident on July 8, 2019. When confronted with this information, Appellant-Mother claimed that the children were in their bedroom and did not see anything. Appellant-Mother also denied that Clarence O. was living with her and the children. However, Clarence reported to the responding officers that he did live at the residence. Additionally, the responding officers found clothing belonging to Clarence's daughter in a bag in the basement. Mother later admitted to the staff at Goodwill Parenting that she was romantically involved with Clarence, and that her son J.H. came to the top of the stairs to ask if she was all right during the altercation. Mother was uncooperative with Agency staff when confronted with the incident. She refused to bring the children to the Agency for an interview or for them to be interviewed alone. Mother also made the statement that this incident was no big deal, and this was all "bullshit". Both A.W. and R.W. III have indicated that they do not feel safe in the care of their Mother.

{¶ 14} Further, the children have disclosed that Mother was allowing them to have phone contact with Appellant-Father R.W., in violation of the no contact order placed at the end of the 2011 cases. The children indicated that Mother intends to marry Appellant-Father R.W. when he is released from prison. There is a history of domestic violence and substance abuse involving Appellant-Father R.W.

{¶ 15} Additionally, A.W. was found to be suffering from a severe case of sunburn when he was removed, and K.H. had a wound on his buttocks that was diagnosed as a staph infection. Mother had not taken either child for medical care for their injuries.

{¶ 16} On November 1, 2019, a pre-trial was held in the instant case and the case was set for an evidentiary hearing to be held on December 12, 2019, along with the permanent custody hearing. All prior orders remained in effect.

{¶ 17} On December 4, 2019, the Guardian ad Litem for the children submitted a report recommending that the children be placed into the permanent custody of SCJFS. Specifically, Attorney Guardado stated that she had no contact with Appellant-Father throughout her more than two-year involvement with the family.

{¶ 18} On December 12, 2019, the trial court heard evidence on SCJFS's complaint seeking permanent custody of the minor children.  (T. at 5-90). The trial court chose to take evidence for both the adjudication and the grounds portion of the permanent custody together.

{¶ 19} The trial court first heard testimony from Stacy DeChellis, the supervising caseworker in charge of the case for the past two and a half years. (T. at 10). Ms. DeChellis testified that the children had been in the temporary custody of SCJFS from August 16, 2017, to July 8, 2019. (T. at 11). Ms. DeChellis testified that the children were

previously found to be dependent children. (T. at 11). Ms. DeChellis testified that SCJFS was previously involved with the family due to Mother's drug use and ongoing domestic violence issues. (T. at 14). She further testified that the children were again removed from Mother's custody two days after they were returned to her custody, after it was discovered that Mother had exposed the children to a "pretty significant" domestic violence incident. (T. at 14). She testified that Mother was living with a man who kicked in the door, threatened to harm the children, and that Mother stabbed the man. (T. at 14-15). Ms. DeChellis testified that the children witnessed the entire incident, and escaped the home by pushing out a window air conditioner system and crawling out. (T. at 15). She testified that Mother did not believe the incident was "a big deal". (T. at 15-16).

{¶ 20} Ms. DeChellis further testified that Appellant-Father is "an extremely violent individual". (T. at 17). She testified that there was a no contact order in place between Appellant and the children. (T. at 17). She testified that Mother and Appellant-Father were planning to continue their romantic involvement once he was released from prison, despite the no contact order. (T. at 18). Ms. DeChellis testified that Appellant-Father did not complete case plan services in the previous case and did not reduce the risk he posed to the children. (T. at 18). Ms. DeChellis testified that Appellant-Father was in prison throughout the prior case and was in prison at the time of the trial. (T. at 25). She further testified that if Appellant-Father was released from prison, she would want him to complete a risk assessment, a parenting assessment, a substance abuse assessment, drug screens, and to follow through with all resulting recommendations. (T. at 26). Ms. DeChellis testified that she believed Appellant-Father was scheduled to be released from prison "about nine months from now". (T. at 27). She testified that Appellant-Father had

"an extensive criminal record" and was considered "a wanted fugitive" during the previous case, after momentarily escaping from jail. (T. at 29).

{¶ 21} The trial court next heard testimony from Chelsea Weigand, the ongoing caseworker assigned to both the 2017 case and the current case. (T. at 32). Ms. Weigand testified that the children had been in the temporary custody of SCJFS from August 16, 2017, to July 8, 2019, and then from July 10, 2019, until the date of the hearing. (T. at 33). She further testified that Appellant-Father's case plan on the previous case included completing a parenting assessment and a substance abuse assessment, but that Appellant did not complete those services. (T. at 34). Ms. Weigand testified that Mother had indicated that Appellant-Father was violent, and that she was afraid of him. (T. at 35). Ms. Weigand also testified that Appellant-Father had been in prison for most of the case and that he had multiple warrants for his arrest. (T. at 35). Ms. Weigand testified that she routinely sent Appellant-Father letters updating him about the case but that, despite the letters, Appellant-Father never contacted her from prison asking about his children or the case. (T. at 36). She further testified that Appellant-Father was not able to work case plan services due to his own actions, which resulted in his being sent to prison. (T. at 45-47).

{¶ 22} The trial court next heard testimony from Carrie Schuring, who was stipulated to by all parties as an expert witness. (T. at 51-52). Ms. Schuring completed trauma evaluations on the children at issue in the cases. (T. at 51-52). She testified that the children told her that they witnessed the domestic violence episode, and that they saw blood and believed their Mother was going to be killed. (T. at 54). One of the children referred to the individual stabbed by Appellant-Mother by the name of "Hoody", and that he had been around before and was someone known to him. (T. at 55). One child

described a song that "Hoody" would sing at Appellant-Mother's home about murdering people with a gun. (T. at 55). Ms. Schuring testified that she diagnosed the children she examined with post-traumatic stress disorder and recommended counseling. (T. at 50-58). She testified that one of the children told her that he did not feel safe in the home. (T. at 56).

{¶ 23} The trial court next heard testimony from Amy Humrighouse, who was the in-home parenting instructor from Goodwill Industries. (T. at 64). Ms. Humrighouse testified that she worked with Mother from February 14th until July 9th. (T. at 65). She further testified that she had no involvement with Appellant-Father.  She testified that Mother only completed one out of six goals set for her. *Id.* She further testified that Mother's home was extremely messy, with a lot of clutter. (T. at 66). She stated that Mother was not able to consistently maintain a safe home. (T. at 67). She testified that the children's behaviors were out of control, and that they were physically violent with each other. (T. at 68). Ms. Humrighouse testified that Mother did not successfully complete the program, and that she did not recommend the children be returned to Mother. (T. at 65, 68).

{¶ 24} Appellant-Father testified on his own behalf. (T. at 73-79). He testified that he did not believe he was a violent person. (T. at 74-75). He also testified that Mother was a truthful person. (T. at 75). Appellant-Father testified that he had earned "about 9" certificates in prison, but could not recall the details of the certificates. (T. at 75). Appellant-Father explained that he did not work case plan services during the prior case because he was "on the run". (T. at 76). He admitted during his testimony that he did not

have a relationship with his children. (T. at 77). Appellant-Father testified that he was not scheduled to be released from prison until October of 2020. (T. at 78).

{¶ 25} During the Best Interest phase of the hearing, the trial court heard testimony again from Caseworker Chelsea Weigand. (T. at 79-89). Ms. Weigand testified that the children are all being set up with counseling to deal with their post-traumatic stress disorder, which was diagnosed through their trauma evaluations. (T. at 80). She further testified that the children were all placed together with their current foster parents during the 2017 case and are extremely bonded to them and call them "mommy and daddy". (T. at 81). The children seek comfort from their foster parents and have stated that they want to stay with them forever. *Id.* Ms. Weigand testified that the foster parents are interested in adopting the children. Tr. at 85. She testified that there was no bond between the children and Appellant-Father, and that he had not visited the children since October of 2017. (T. at 82). Ms. Weigand testified that permanent custody of the children was "absolutely" in their best interests. (T. at 84).

{¶ 26} Attorney Kristen Guardado, Guardian ad Litem for the children, briefly made a statement and recommended that permanent custody of the minor children be granted to SCJFS. (T. at 89).

{¶ 27} The trial court took the matter under advisement, and on December 16, 2019, the trial court issued its findings of fact granting permanent custody of the minor children to SCJFS and terminating both Mother and Appellant-Father's parental rights. The trial court found that the children could not and should not be placed with Appellant-Father or Mother at this time or within a reasonable period of time, that the children had

been in the temporary custody of the Agency for more than 12 of 22 months, and that permanent custody was in the children's best interest.

**{¶ 28}** Appellant-Father now appeals, raising the following assignments of error:

ASSIGNMENTS OF ERROR

**{¶ 29}** "I. THE JUDGMENT OF THE TRIAL COURT THAT THE MINOR CHILDREN CANNOT AND SHOULD NOT BE PLACED WITH APPELLANT AT THIS TIME OR WITHIN A REASONABLE PERIOD OF TIME WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

**{¶ 30}** "II. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR CHILDREN WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

I., II.

**{¶ 31}** We address Appellant-Father's assignments of error together. In his first assignment of error, Appellant-Father argues the trial court erred in awarding permanent custody to SCJFS because SCJFS failed to demonstrate that the minor children could not be placed with him within a reasonable period of time. In his second assignment of error, Appellant argues the trial court's finding that an award of permanent custody to SCJFS is in the children's best interest is against the manifest weight and sufficiency of the evidence. We disagree.

**{¶ 32}** As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. *Cross Truck v.*

*Jeffries,* Stark App. No. CA5758 (Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

**{¶ 33}** R.C. §2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. §2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

**{¶ 34}** Following the hearing, R.C. §2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

**{¶ 35}** In determining the best interest of the child at a permanent custody hearing, R.C. §2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with

the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

{¶ 36} Therefore, R.C. §2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. §2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

{¶ 37} Here, R.C. §2151.414(B)(1)(d) applies as the children have been in the temporary custody of the Agency for twelve or more months of the consecutive twenty-two month period.

{¶ 38} If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. §2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. §2151.414(E)(1) through (16) exist with respect to each of the child's parents.

{¶ 39} As set forth in detail in our statement of the facts and case, *supra*, Appellant-Father failed to successfully complete his case plan. He was incarcerated for almost all

of the duration of the children's cases and was still incarcerated at the time of the permanent custody hearing. Appellant-Father has not visited with the children since October, 2017. Testimony was also presented that Appellant-Father was "an extremely violent individual" and that there was a no contact order in place between Appellant-Father and the children. (T. at 17).

**{¶ 40}** Appellant-Father admitted that he had failed to complete his case plan, citing the fact that he was on the run as the reason for his failure. He further admitted that he had no relationship or bond with his minor children.

**{¶ 41}** The trial court found that Appellant-Father is unable to remedy the problems that led to removal of the children or that he will remedy these problems within a reasonable period of time.

**{¶ 42}** As to best interests, the GAL and Caseworker Weigand testified to their opinions that permanent custody to SCJFS was in the children's best interest. The trial court found that both of the children had been diagnosed with post-traumatic stress disorder, and that they were undergoing counseling at school. The court further found that the children are placed together with the same foster family, with their other two siblings, are bonded with their foster parents, and that they call them mommy and daddy. It is the children's wishes to remain with their foster family. The children feel safe with their foster family. The children do not feel safe with Mother. Further, the foster parents are interested in adopting the children. (T. at 85).

**{¶ 43}** A.W. and R.W. have no bond with their biological father, Appellant-Father R.W. Appellant-Father is currently in prison for charges arising out of Coshocton County. He has been incarcerated for the length of this case. R.W. is not scheduled to be released

until October of 2020. Due to his incarceration, the father is unable to adequately care for A.W. or R.W. or attend to their needs. During the previous case and this case, there was/is a no contact order in place between R.W. and the children A.W. and R.W.

**{¶ 44}** Additionally, the children had been in the temporary custody of the SCJFS for twelve or more months of a consecutive twenty-two month period.

**{¶ 45}** The evidence presented at the hearing demonstrated that permanent custody to SCJFS is therefore in the children's best interest.

**{¶ 46}** Based upon the forgoing, we overrule Appellant-Father's first and second assignments of error.

**{¶ 47}** For the foregoing reasons, the judgment of the Court of Common Pleas, Juvenile Division, Stark County, Ohio, is affirmed.

By: Wise, P. J.

Delaney, J., and

Baldwin, J., concur.

JWW/k 1005